# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Elaine E. Bucklo | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 99 C 4609 | **DATE** | 8/13/2001 |
| **CASE TITLE** | Vector Pipeline vs. 68.55 Acres of Land, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Vector's motions to modify or reject Report are denied. Various defendants' motions to modify the Report are also denied. McDonnell defendant's motion to strike Vector's exhibit 53 is denied. The Report of the Commissioners, with the amendment as to the interest rate set forth in the Commissioners' response is adopted. Plaintiff is to pay the various defendants in the amounts specified in the Report, plus 7 % compound interest from May 15, 2000 until August 28, 2001. Defendants shall each calculate the total sum due to them, and serve it on plaintiff, who shall stipulate to the accuracy of the calculations. The stipulation shall be submitted to court by 8/28/01. Judgment will be entered on that date. Enter Memorandum Opinion and Order.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | 13 number of notices | **Document Number** |
| | No notices required. | | |
| ✓ | Notices mailed by judge's staff. | AUG 1 4 2001 date docketed | 275 |
| | Notified counsel by telephone. | | |
| | Docketing to mail notices. | a docketing deputy initials | |
| | Mail AO 450 form. | | |
| | Copy to judge/magistrate judge. | 8/13/2001 date mailed notice | |
| MPJ | courtroom deputy's initials | ED-7 FILED FOR DOCKETING 01 AUG 13 PM 6: 01 Date/time received in central Clerk's Office | MPJ6 mailing deputy initials |

DOCKETED

AUG 1 4 2001

| | | |
|---|---|---|
| **VECTOR PIPELINE, L.P.,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 99 C 4609 |
| | ) | |
| **68.55 ACRES OF LAND**, et al. | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

In this condemnation case under the Natural Gas Act, 15 U.S.C. § 717, *et seq.* ("NGA"), Vector Pipeline ("Vector") took permanent and temporary easements in several tracts of land in Northern Illinois to build a natural gas pipeline. It acquired the appropriate Federal Energy Regulatory Commission ("FERC") certification, and invoked its power of eminent domain. When attempts to settle issues and differences with the landowners failed, Vector sued on 14 July 1999. In March 2000, I granted summary judgment for Vector, and appointed a Commission under Fed. R. Civ. P. 71A to determine just compensation due to the defendants. I gave Vector immediate possession in an order of May 15, 2000. Following extensive hearings, the Commissioners submitted their Report. Vector and several defendants offer objections to the Report. I reject these objections, adopt the Report, with the amendment as to the interest rate that the Commissioners set forth in the response to the objections, and order that judgment be entered for the defendants in the amounts specified below.

Under Rule 71A, I accept the Commissioners' findings of fact unless clearly erroneous. *United States v. 573.88 Acres of Land,* 531 F.2d 847, 850 (7th Cir. 1975); Fed. R. Civ. P. 71A(h) (Commission's findings have effect of a special master's report under R. 53(e)(2) (report reviewed for clear error)). The burden of showing the Report to be clearly erroneous is on the party attacking the conclusions. *United States v. Certain Land Situated in Ripley, Stoddard and Butler Counties, Mo.,* 109 F. Supp. 618, 621 (E.D. Mo. 1952). I review conclusions of law de novo. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 391 (7th Cir. 1992). "Just compensation" is "that amount of money necessary to put a landowner in as good a pecuniary position, but no better, as if his property had not been taken." *United States v. L.E. Cooke Co., Inc.,* 991 F.2d 336, 341 (6th Cir. 1993). It is measured by the use that would bring the highest price – the "highest and best" use. *United States v. 69.1 Acres of Land,* 942 F.2d 290, 292 (4th Cir. 1991). In the absence of proof to the contrary, the highest and best use of property is presumed to be its current use. *Id.* The burden of proving the value of the land taken is on the landowner. *United States ex rel. TVA v. Powelson*, 319 U.S. 266, 274 (1943).

I must first discuss which law controls. Oddly enough, the parties do not disagree on this, but Vector attempts to manufacture a disagreement that does not exist. Vector says that federal

substantive law controls the measure of damages in all respects. It accuses the Commissioners of improperly applying state substantive law, although the Commissioners expressly endorse an appraisal format approach approved by the Seventh Circuit using only federal law support, *see United States v. 105.40 Acres of Land*, 471 F.2d 207, 210 (7th Cir. 1972), and reject what they call "the Illinois state court approach." The Seventh Circuit endorsed the proposition "that the measure of damages is the fair market value of the entire [property] before and after the taking." *Id.*

This "before and after" approach was expressly adopted by the Commissioners, who explained that it requires that "the appraiser first value the property as a whole and then value the remainder (including the owner's rights in the easement strip and in any temporal easements or work space). The Commissioners cite *United States v. 38.60 Acres of Land*, 625 F.2d 196, 199 n.1 (7th Cir. 1980) (Damages are measured by the "difference between the market value of the entire tract immediately before the taking and the market value of the remainder immediately after the taking."). On this approach, the difference between the two values is the basis for determining just compensation. *See United States v. Banisadr Bldg. Joint Venture,* 65 F.3d 374, 378 (4th Cir. 1995); *United States v. 8.41 Acres of Land,* 783 F.2d 1256, 1257 (5th Cir. 1986); *United States v. 38.60 Acres of Land in Henry County, Mo.*, 626 F.2d 196, 199 (8th Cir. 1980). These are all federal cases. Vector

agrees that this is the right approach, and it fails to substantiate its claim that the Commissioners covertly used an Illinois state law approach in practice despite having officially endorsed the federal "before and after" approach that Vector itself calls for.

In any event, Vector fails to tie its claims about the controlling law to any specific difference in outcomes in damages evaluation. Instead, Vector argues that federal law requires the wholesale rejection of the Commissioners' findings because the determinations of the Commissioners were clearly erroneous or based on inadmissable evidence.

II.

A.

I now turn to the objections of various defendants, then take up Vector's objections. The McDonnell defendants object that the Commissioners erred with respect to their parcels in not taking into account the effect on the remainder of certain access rights.[1] The McDonnell defendants say their land could not be developed, given the access rights granted to Vector. The highest and best use of their property is development for mixed-use residential and commercial purposes, but Vector acquired "unlimited" rights to cross the remainder to reach the easement that it took.[2] There was

---

[1] This argument is made, *mutatis mutandis*, by the Block defendants as well, and I reject it for similar reasons.

[2] Vector disputes this. I discuss the matter below.

4

testimony by the McDonnell defendants' expert appraiser, Christopher Lannert, that it is impossible to develop a plan that is subject to such access.

The issue, then, is the factual question of whether the taking destroys the value of the property for its highest and best use. Lannert's testimony, the McDonnell defendants say, is uncontradicted. But Vector's appraiser, Joseph Batis, testified to the contrary, arguing that the access rights would have no effect on the value of the remainder. The McDonnell defendants argue that the Commissioners found Batis' testimony "unpersuasive." What the Commissioners rejected, however, was the flat claim that there would be no effect on the value of the property. It does not follow that the Commissioners had to agree that the effect was as total as Lannert claimed, utterly precluding residential and commercial development, and consigning the tract to agrarian uses only. A finder of fact is "free to believe part of [a witnesses'] testimony and to reject other parts." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1378 (7th Cir. 1995). The Commissioners found some diminution in value, thus disagreeing with Batis, but they were not persuaded by Lannert's testimony as to how much diminution there was.

Even were Lannert's testimony in fact uncontradicted, the "trier of fact [may] disbelieve uncontradicted testimony unless other evidence shows that the testimony must be true." *EEOC v. G-K-G, Inc.*, 39 F.3d 740, 746 (7th Cir. 1994) (citing cases).

5

Nothing here shows that the testimony must be true, and it is not believable that a property could not be developed for residential or commercial use merely because workers could cross it to reach an easement. As Batis said, there is a distinction between a pipeline company that may need to cross from time to time and a third party that may access the property at any time.[3]

The McDonnell defendants also argue that because Batis found no reduction in value to the remainder due to the access rights, the Commissioners failed to take any reduction in value into account. This is untrue on the face of the Report, which concludes that there was a "loss of developable land that had an effect on the fair market cash value of the remainder." Report at 85. The McDonnell defendants just disagree with the Commissioners about what that loss comes to – essentially a difference of a factor of 10, roughly $300,000 as opposed to roughly $2.5 million. I find no clear error in the Commissioners' findings, and deny the McDonnell defendants' motion to modify the Commissioners' Report. I also reject as moot their motion to strike Vector's exhibit 53.

B.

The Block defendants object that it was error for the Commissioners to find that the "highest and best use" of their affected land was "to hold for investment." The Commissioners

---

[3] In fact, Vector has stated that it will access the pipeline only from public roads or through the easement unless a landowner consents to having pipeline workers cross the land.

6

reasoned that the Block defendants had not shown a "reasonable probability" that their tracts, which presently lack sewer and water connections, would be developed within three to four years of the valuation date. The Block defendants contend that the land should be appraised on the assumption of "commercial usage." Their argument seems to be that the Commission assumed that any delay in development would be due to the pipeline, but the valuation should be done as if there were no pipeline. That is what the Commissioners did. The Block defendants ask, "would a willing purchaser purchase these properties without a development purpose?" However, the Commissioners concluded that the land would be developed, even without the pipeline – the question was rather when, as indeed the Block defendants admit. They offer nothing to show an earlier date of development other than some remarks about how fast Will County is growing, the proximity of a four lane highway, and the projected opening of a NASCAR auto racing facility on that road in 2001. These generalities do not create a reasonable probability that their land in particular will be developed within three or four years. There was no clear error here. The Block defendants' motion is denied.

C.

The Jones defendants argue that the Commissioners clearly erred in valuing their land because they relied on the testimony of Batis, who appraised only the northern parcel and not the southern one. The

Jones defendants moved unsuccessfully that the Commissioners strike Batis' testimony with respect to their land. They now ask me to find that this refusal to strike this testimony was error, and that the testimony of their own appraiser, Michael MaRous, was the only competent evidence, and, finally, that the Commissioners were required by law to accept MaRous' valuation.

MaRous' testimony was in fact contradicted by Batis' testimony as well as by the evidence of their own view of the land. The Jones defendants' argument that I must agree with MaRous depends in part on my striking Batis' testimony, which I decline to do. His evidence was competent: though limited in scope, it was valuable for what it was. As I explained in discussing the McDonnell defendants' objections, the Commissioners did not accept all of Batis' conclusions, but a finder of fact may accept certain aspects of a witness' testimony and reject others. *Bergmann*, 65 F.3d at 1378. As the Jones defendants' own attachments show, Batis' testimony was clearly delimited. It was properly considered.

Moreover, even if I were to treat MaRous' testimony as uncontradicted, the Commissioners would not have had to believe it. The Jones defendants rely on several Illinois state cases regarding procedure in similar cases. *See, e.g., Dep't of Public Works v. Wilson & Co., Inc.*, 340 N.E.2d 12, 19 (Ill. 1976); *City of Chicago v. Riley*, 157 N.E.2d 46, 50 (Ill. 1959), but Rule 71A imposes federal practice and procedure in federal eminent domain cases.

These state cases are therefore inapposite. The Jones defendants do indeed cite an old Seventh Circuit case for the proposition that if evidence is unopposed, it must be accepted. *See United States v. 685.2 Acres of Land,* 146 F.2d 998, 998 (7th Cir. 1945) (per curiam). That view has since been rejected, as noted earlier. *G-K-G, Inc.,* 39 F.3d at 746. MaRous' testimony was not, in any event, uncontradicted.

Moreover, there was additional evidence, apart from Batis' testimony, that contradicted MaRous' conclusion. The Commissioners based their valuation of the entire property (both parcels) on "the evidence presented, *and our own view of the property and the surrounding area*" (Report at 117, emphasis added). No party objected to the Commissioners' taking a view, *see* Rule 71A(h) advisory committee's note (The greater practicability of a view of the premises is a basis for authorizing a land commission.), and I conclude that the view of the land was proper and an independent source of evidence apart from the testimony presented. *See In re Application to Take Testimony in Criminal Case Outside District,* 102 F.R.D. 521, 524 (E.D.N.Y. 1984) (cited favorably in *Devin v. DeTella,* 101 F.3d 1206, 1208, 1209 n.2 (7th Cir. 1996)) ("Authorities now generally agree that the [jury] view provides independent evidence.") (criminal contexts). A rare case commenting on the effect given to a Rule 71A land commission's view held that the "view was accorded the dignity of testimony in the record."

*Certain Land Situated in Ripley, Stoddard and Butler Counties, Mo.,*
109 F. Supp. at 621. "[T]he commission's view of the land is
entitled to weight and consideration in passing on a motion to
reject their finding." *Id.* (*citing* IV *Wigmore on Evidence*, (3d ed.
1940) § 1168, at 289 ("'[I]t is wholly incorrect in principle to
suppose that an autoptic inspection by the tribunal does not supply
it with evidence.'")).  The Jones defendants' motion is denied.

III.

A.

Vector offers a 60 page (!) set of objections without a table
of contents or much discernable structure.  This district has a
published limit of 15 pages for briefs, which I am willing to extend
in special circumstances to 20 pages.  Because of the complexity of
this case and the number of defendants, I might have been willing,
had I been asked, to extend the limit somewhat over 20 pages, but
there is no excuse for a brief that is four times the normal limit.[4]
However, I have read Vector's excursus, and I will consider it
despite its outrageous length.

B.

---

[4] In 16th century England, Lord Keeper Thomas Edgerton of the
Court of Chancery reportedly sanctioned an attorney who filed a 120
page brief, ordering counsel to cut a hole through the manuscript,
stick his head in it, and be led around Westminster. Catherine
Drinker Bowen, *The Lion and the Throne: The Life and Times of Sir
Edward Coke* 110 (1957) (standard modern biography of Sir Edward
Coke).  This particular sanction is not authorized by the Federal
Rules, but I would be within my discretion to strike Vector's
objections.

10

Vector objects that the Commissioners' damages figures are speculative because they are not based on factual data from the marketplace. The defendants' appraisers relied on their subjective experience, it argues, and the Commissioners more or less split the difference between the defendants' figures and Vector's. It objects that this was clear error, and that the testimony of the defendant's appraisers should have been excluded under Fed. R. Evid. 702.

However, no specific methodology is required for a valuation hearing in a federal condemnation case. The Supreme Court has imposed only the requirement that the general process by which the conclusions are derived be "distinctly marked." *United States v. Merz*, 376 U.S. 192, 198 (1964). The Court explained:

> The commissioners need not make detailed findings . . . . [but] [c]ommissioners . . . [should] reveal the reasoning they use in deciding on a particular award, what standard they try to follow, which line of testimony they adopt, what measure of severance damages they use, and so on. . . . [Not] every contested issue raised on the record before the commission must be resolved by a separate finding of fact. . . . There [need not] be an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based. The path followed by the commissioners in reaching the amount of the award can, however, be distinctly marked.

*Id. See also 573.88 Acres of Land*, 531 F.2d at 849 ("Commissioners are not required . . . to develop and apply a mathematical formula which can be programmed, computerized and then reviewed by the district court like an algebraic equation."). Commissioners may use the testimony of "experienced, qualified, competent appraisers," and "rel[y] on their valuations . . . , without any evidence of bad

faith." *United States v. 1,378.65 Acres of Land*, 794 F.2d 1313, 1319 (8th Cir. 1986). Such a "course of conduct is solid, well founded, and clearly reasonable." *Id.* Because "the value of property taken . . . , which is no longer on the market, is largely a matter of opinion," *United States v. 68.94 Acres of Land*, 918 F.2d 389, 393 (3rd Cir. 1990), "there are no infallible means for determining with absolute conviction what a willing buyer would have paid a willing seller for the condemnees' property at the time of taking." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1077 (5th Cir. 1996). "Real estate appraisal is not an exact science." *Latimore v. Citibank Federal Savings Bank*, 151 F.3d 712, 715 (7th Cir. 1998). A land commission is "not required to evaluate every piece of evidence and every line of testimony presented to it[, otherwise] its report would be almost as bulky as the trial transcript itself." *Washington Metro. Area Transit Auth. v. One Parcel of Land in Montgomery County, Md.*, 549 F. Supp. 584, 587 (D. Md. 1982), *aff'd*, 720 F.2d 673 (4th Cir. 1983).

Although "[c]onclusory findings are alone not sufficient," *Merz,* 376 U.S. at 198, the Commissioners here do not present merely conclusory findings. Their Report is conscientious and careful. They were quite thorough in discussing the bases on which they accepted or rejected the testimony of various experts with regard to particular valuations. They did not mechanically "split the difference," but looked at the conflicting valuations involved with

each separate parcel in light of the evidence presented and gathered, which they weighed quite carefully, scrupulously assessing the weight and value of the testimony offered, as their discussion of the defendants' objections above illustrates.

Vector objects that the Commissioners' results are flawed because the defendants failed to offer paired sales analyses or sales of parcels with comparable numbers of pre-existing easements in all cases. (They did in some, *e.g.*, with the Block, Bernhard, McDonnell defendants. Report at 47, 55-56, 78). As explained, no particular methodology is required. Comparable sales are only one method of estimating property values. Other methods may be used "where no comparable sales exist." *United States v. 99.66 Acres of Land*, 970 F.2d 651, 655 (9th Cir. 1992) (discussing various alternative appraisal methodologies). When Vector asked its own appraiser, Batis, to conduct such an analysis, he was unable to find one example of a transaction that the Commissioners believed persuasively lent itself to such an analysis. *Id. at* 31. However, because, as the Commissioners respond, "land is unique," this is neither surprising nor fatal to an appraisal.

Vector also objects that the Commissioners did not state separately the amount of damages attributed to each element that they took into consideration. However, as the Commissioners explain, that would violate the "before and after rule." *See 38.60 Acres of Land in Henry County, Mo.*, 625 F.2d at 199 n.2 ("The matter is taken

care of automatically in the 'before and after' submission."); Interagency Land Acquisition Conference, *Uniform Appraisal Standards for Federal Land Acquisitions*, Sec. B-11, at 51 (Washington, D.C. 2000) ("method automatically includes" severance damages and any special benefits), http://www.usdoj.gov:80/enrd/land-ack/yb2001.pdf (accessed Aug. 2, 2001). The specific damages need not be disaggregated.

Vector objects to the Commissioner's acceptance of "stigma" damages based in the testimony of the defendants' experts. Vector cites two studies, a Kinnard study used by MaRous, and a FERC report, which it says failed to find market data support for a "stigma" effect of price reductions because of the proximity of a pipeline due to fears about possible mishaps. The Commissioners, however, credited the testimony of admittedly qualified real estate appraisers that such an effect existed. The defendants were not required to match Vector study for study or produce evidence of a particular type. The Commissioners were not required to accept the conclusions of the two studies, as characterized by Vector, and to reject the views of experienced and qualified appraisers. Rule 702 "specifically contemplates the admission of testimony by experts whose knowledge is based on experience." *Walker v. Soo Line Ry. Co.* 208 F.3d 581, 591 (7th Cir. 2000); Fed. R. Civ. P. 702 (An expert may be qualified by "knowledge, skill, experience, training, or education."). Reversing a Rule 702 exclusion of evidence of stigma

damages, the Fifth Circuit has reviewed many cases finding that potential buyer's fears that might make property less desirable were properly considered. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1078-79 (5th Cir. 1996) (citing cases). Such testimony may be credited as well as admitted.

Vector's other objections to the Commissioners' methodology are equally without merit, and do not require specific separate treatment. Moreover, Vector does not explain, except in very general terms, how the supposed methodological errors led to unsupported conclusions in particular cases. In view of the deferential review accorded the Commissioners' findings, sweeping objections of the sort bruited here, unmoored to particular errors or specific contested evaluations, cannot justify setting aside the Commissioners' conclusions as clearly erroneous. As to the Rule 702 objection, because land valuation is a matter of opinion, I should "proceed cautiously before removing from the [fact finder's] consideration expert assessments of value which may prove helpful." *564.54 Acres of Land*, 918 F.2d at 393. Such objections generally go to the weight rather than the admissibility of the testimony. I decline to exclude the evidence.

C.

Vector argues that the Commissioners clearly erred in concluding that the value of the condemned land was reduced by the access rights to and from the permanent easement. Vector's

15

condemnation complaint sought and won a "right of ingress and egress to and from the . . . right of way for all purposes convenient or incidental to the operation of the . . . pipeline." Vector says that this is "merely descriptive of the right inherent in any utility type easement to come and go on the right of way." That does not mean the value of the land was not reduced thereby, and I have noted above that the Commissioners did not accept some of the defendants' more extreme claims about how much the value was reduced.

To support the claim that it has no such access rights as would reduce the value of the property, Vector argues that it informed the defendants that it sought no rights outside the permanent easement strip itself, and it would only access the pipeline right of way by public roads or the easement itself unless it obtained permission from the landowner, and it represented this in a statement of August 15, 2000, to the Commissioners. Vector asked me to treat this as a unilateral stipulation limiting its rights of access, which, in an order of November 1, 2000, I declined to do.

I explained there that, under Rule 71A(i), a condemnation suit may be dismissed "at any time before 'compensation has been determined and paid,' unless the [plaintiff] previously has 'acquired the title or a lesser interest.'" *Kirby Forest Indus.*, 467 U.S. at 12 (quoting Rule 71A(i)). The Supreme Court stated that:

> After commencement of the valuation hearing, the [plaintiff] may dismiss the suit only pursuant to a stipulation with the

> owner, or with the approval of the district court. The Rule does not suggest that a court order dismissing a suit has the effect of nullifying a taking that has already occurred. Indeed, to the contrary, the Rule forbids the district court to dismiss an action (without awarding just compensation) if the [plaintiff] has acquired any "interest" in the property.

*Id.* at 12 n.18. The taking had occurred by the time that Vector attempted to unilaterally stipulate to the Commissioners in August 2000 that it sought lesser rights than it had won, and the valuation hearing had of course commenced. By August 2000, in fact, Vector was in possession of the land and constructing the pipeline. Therefore, where there had not been a stipulation forthcoming from the defendants, no such amendment was possible.

Rather than suggesting an alternative interpretation of the plain language of Rule 71A(i) and the Supreme Court's authoritative pronouncement, Vector offers, in support of the propriety and efficacy of a unilateral stipulation by the condemnor, a series of state law cases, including at least one dating back to 1889, and one unpublished order, *Northern Border Pipeline Co. v. 64.11 Acres of Land*, No. 00 C 3122 (N.D. Ill. Nov. 29, 2000). In that case, the court relied on a 1933 state law case, *East Peoria Sanitary Dist. v. Toledo P. & W.R.R.*, 187 N.E. 512, 516 (Ill. 1933), itself interpreting only state law and not the federal Takings Clause, much less the Federal Rules of Civil Procedure, which of course did not then exist (they were effective as of 1938). As I stated in my order of November 1, 2000, Vector has "discovered that the judgment

it won gave it more of a title than it wanted to pay for," but it must pay for what it won nonetheless.

D.

The next topic is whether the Commissioners correctly valued the effect on the land values of the temporary easements for the construction of the pipeline. Batis, like the defendants' experts, used a return on investment approach, and used 15% as an appropriate return. However, Vector objects that the Commissioners improperly held these easements to be of three years duration on the grounds that they would terminate "not later than October 1, 2002" (in the language of the complaint). Vector says that this was wrong because the complaint provided that the temporary easements would terminate upon completion of construction and restoration, and the pipeline had been installed on the defendants' land and the restoration work concluded before the Commissioners had completed their hearings.

With a temporary easement the valuation of damage is indeed measured by the time of occupancy or use. *See Kimball Laundry v. United States*, 338 U.S. 1, 7 (1949). However, Batis estimated the duration of the easements based on a one year period rather than the actual time it took to complete. The difference between the approach taken by the Commissioners and by Batis is therefore a difference in the estimates of the duration of occupation rather than the difference between an estimate and an actual measure of the time

18

required. The question is, which of these two estimates (if either) is to be accepted?

Here, the Commissioners say in their response to Vector's objections that they believed MaRous, whose experience with 200-300 easements was that condemnors intentionally choose the length of the temporary easement with the expectation that this will be the amount of time needed; MaRous also reports experience with settling problems resulting from trenching projects like this one. Therefore, the Commissioners fixed on the time that Vector itself had selected in its complaint by which all work was to be complete, and reasonably concluded that Vector had not shown that it had completed restoration of the various tracts before then, or that it would make any significant difference if it had done so.

In its objections, Vector does introduce evidence about the actual date of completion in one instance, that of the Bonnema defendants. The Commissioners say that Mike Lane, the pipeline project manager, "specifically testified that restoration was not complete" on that property. Report at 8. Vector objects that Lane visited the property on August 24, 2000, before the work was completed, and Bonnema admitted that the work was completed on August 27, 2000. That might be construed as an admission, but, first, it is not evidence of when work was complete on any other property. More importantly, Vector does not say what difference it would make even in the case of that property, or show that it would

be anything but a nominal difference. Indeed, all Vector says is that the Commissioners' entire report should be rejected because, with regard to this one property, the actual period of occupation is known. Vector has failed to offer what it itself demands of the Commissioners, expert opinion about the precise monetary value, or even a ballpark estimate, of the amount of damages as it calculates them to be based on this fact. Batis, as explained, testified only based on his one year estimate. Because the burden is on the party attacking the Commissioners' conclusions, Vector has failed to carry its burden. I affirm the Commissioners' results with regard to the temporary easements.

E.

The Commissioners initially determined that Vector should pay the defendants interest at the rate of 9% since the date of taking that the parties agreed to, July 14, 1999. Nine percent was approximately the prime rate for the week ending May 12, 2000. Vector objects that, first, payment of interest should be confined to any deficiency posted for each tract because it made a $2.5 million deposit pursuant to my order to protect the interests of the defendants. Vector says that there are no deficiencies, because the award was only $1,615,000 in total, so that it need not pay any prejudgment interest. Vector also objects that the rate of interest is too high. The Commissioners, in their response, concede the latter point. I consider these issues in turn.

Vector argues that when a condemnor makes a deposit to secure a landowner for a taking prior to entry of a final judgment, the deposit limits any interest obligation to any deficiency, so long as the deposit is available to the landowner. It refers by analogy to the interest-limiting provisions of the Declaration of Taking Act, 40 U.S.C. § 258a(5) ("DTA") ("[I]nterest shall not be allowed on so much thereof as shall have been paid into the court.") (governing takings by the United States), and cites cases saying that this statute's provisions are not the exclusive means of preventing the accrual of prejudgment interest. However, it does not follow that Vector's deposit prevented the accrual of interest here, where the statute is inapplicable. Indeed, the Commissioners concluded that, even granting the interest-limiting principle, prejudgment interest should accrue here because the defendants had no statutory right to seek access to the funds posted.

Vector responds that the defendants' access to the funds did not depend on any statute. It cites in support *United States v. Hirsch*, 206 F.2d 289 (2d Cir. 1953), but in that DTA case the deposit was made after judgment, *id.* at 294, and so cannot illuminate a question of prejudgment interest outside a DTA context. Vector also refers me to *United States v. 211.59 Acres*, 179 F. Supp. 431 (N.D. Ca. 1959), which has the same defects. *Id.* at 434. The other cases cited by Vector are all DTA cases, inapt here. The defendants lacked access to the money on deposit because, until the

21

Commissioners had completed their deliberations, there was no determination of what any party was entitled to. Without at least a provisional determination, the defendants would not have been allowed to have the bank that held the funds issue them a check. Finally, nothing in Rule 71A(j) stops the accrual of, or even mentions, interest, nor does Vector point me to any applicable provision of the NGA or any other applicable law that has the interest-limiting effect of § 258a(5) of the DTA.

Vector also objects that the 9% rate is too high because the defendants could not claim to be prime corporate borrowers, so the prime lending rate at the time could not apply to them. As investors, they would have been able to do no better, Vector says, than the prevailing money market rates, that is, 6%-7% at the time. In their response, the Commissioners agree, and therefore I follow them in setting the interest rate at 7%. Because Vector concedes that 7% would be within a reasonable range if I award interest at all, I affirm this award.

F.

Vector offers various objections to the compensation the Commissioners awarded to specific defendants. First, Vector says that the Block, Bernhard, Tewes, Radakovich, and Busch defendants failed to disclose any actual development plans or increased development costs due to the pipeline, or to disaggregate the effects of the size and location of the pipeline, access rights, and

stigma effects. Vector also claims that the Commissioners failed to account for the effect of other pipelines on the value of the defendants' land. As explained above, however, this argument presupposes a degree of specificity that is not required of the Commission. *See Merz*, 376 U.S. at 198 ("The commissioners need not make detailed findings [or provide] an array of findings of subsidiary facts to demonstrate that the ultimate finding of value is soundly and legally based."). The Commissioners here *did* carefully examine and weigh the evidence of the various claims made by the defendants in arriving at their several awards.

Vector argues further that these defendants failed to prove that their land was ripe and ready for development within the appropriate time frame. This mistakes the burden of proof on the party attacking the Commissioners' Report, which is on the party attacking its conclusions. *Certain Land Situated in Ripley, Stoddard and Butler Counties., Mo.,* 109 F. Supp. at 621. More importantly, the argument that these defendants did not show the likelihood of rapid development is disingenuous at best because the Commissioners specifically found, with respect to each and every one of these defendants, that the highest and best use of their land was to hold for investment – precisely because the evidence did not support a reasonable probability that the land would be developed in the near future. Far from failing to take this into account in making their awards, the Commissioners made it the basis of those awards. The

rest of Vector's attacks on the awards to these defendants are vitiated by similar misunderstandings of the obligations of the Commissioners and the burden of an objecting party.

With respect to the Ghali defendants, there are similar problems with Vector's objections, but Vector also adds that it was improper to compensate the Ghali defendants for damage due to a remainder previously unburdened by easements because this involved treating it as if it were a separate property. Even if this is so, Vector does not show, or even argue, that the award would be less if the remainder together with the rest of the land were valued as a whole, and so Vector fails to carry its burden.

The McDonnell, Bonnema, and Jones defendants had their land evaluated under the presumption that its highest and best use would be residential and commercial. Vector objects that the plans these defendants presented for development were only "contingency plans reflecting possibilities" that could be developed in different ways. However, Vector admits that these defendants' lands are properly classifiable for residential and commercial development under a highest and best use determination, so the point of the argument is unclear. Vector complains that the Commission has not quantified the losses due to its pipeline, but what is a compensation award if not a quantitative money value placed on a loss? If the point is that the Commission has not proved that these defendants will incur losses in precisely that amount, given that their property could be

developed in various ways, the answer is that they do not have to. "Commissioners are not required . . . to develop and apply a mathematical formula which can be programmed, computerized and then reviewed by the district court like an algebraic equation." *573.88 Acres of Land*, 531 F.2d at 849.

Vector also complains that the Commissioners failed to take into account the effect of existing pipelines in their determination that there would be stigma damages due to Vector's construction on the McDonnell properties, which has six other gas pipelines. Why, Vector asks, would the McDonnell defendants have bought their properties if there was a stigma effect? But this is not to the point: the McDonnell defendants might have bought the property at a price that was reduced because of the stigma effect, and further pipeline construction might well have depressed its value even more, as the Commissioners concluded that it did. Similar points apply to Vector's objections to the valuation of the Jones property.

IV.

I DENY the McDonnell defendant's motions to (1) modify the Commissioners' Report, and (2) strike Vector's exhibit 53. I DENY the motions of (4) the Block defendants and (5) the Jones defendants to modify the Report, and I also DENY (6) Vector's motions to modify or reject the Report. I ADOPT the Report of the Commissioners, with the amendment as to the interest rate set forth in the Commissioners' response; and Vector is to pay the various defendants

25

in the amounts specified in the Commissioners' Report, plus 7% compound interest from May 15, 2000 until August 28, 2001. The defendants shall each calculate the total sum due to them, using the 7% interest rate, and serve it on Vector, who shall stipulate to the accuracy of the calculations. The stipulation, with each defendants' award specified separately, shall be submitted to me no later than noon, August 28, 2001. Judgment will be entered on that date.

**ENTER ORDER:**

_____

**Elaine E. Bucklo**
United States District Judge

Dated:    August 13, 2001